People v Kukic (2021 NY Slip Op 03996)





People v Kukic


2021 NY Slip Op 03996


Decided on June 22, 2021


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: June 22, 2021
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Rolando T. Acosta
Troy K. Webber Tanya R. Kennedy Martin Shulman


Index No. 74/16 Appeal No. 13870-71 Case No. 2020-00832, 2020-01537 

[*1]The People of the State of New York, Respondent,
v
Dilber Kukic, Defendant-Appellant, Michael Hyrnenko, et al., Defendants. _ The People of the State of New York, Respondent,



Defendants appeal from the judgments of the Supreme Court, New York County (Michael J. Obus, J.), rendered January 17, 2020, as amended February 5, 2020, convicting defendants, after a jury trial, of manslaughter in the second degree (two counts), assault in the second degree (nine counts), assault in the third degree (four counts) and reckless endangerment in the second degree, and sentencing each defendant to an aggregate term of 4 to 12 years.




The Baker Law Firm for Criminal Appeals, PLLC, Bronx (Mark M. Baker of counsel), and Brafman & Associates, New York (Marc Agnifilo and Joshua Kirshner of counsel), for Dilber Kukic, appellant.
Mischel and Horn, New York (Richard E. Mischel of counsel), for Maria Hrynenko, appellant.
Cyrus R. Vance, Jr., District Attorney, New York (Sylvia Wertheimer and Alice Wiseman of counsel), for respondent.



ACOSTA, P.J. 


On March 26, 2015, two people were killed, and 13 others injured in an explosion that followed the rigging of a gas line from one building to another, without Con Edison approval, by an unscrupulous landlord. For their role in planning, building and operating this unauthorized, makeshift and dangerous gas-delivery system, the landlord, defendant Maria Hrynenko, and her general contractor, defendant Dilber Kukic, were convicted of manslaughter in the second degree, assault in the second and third degrees and reckless endangerment in the second degree. [FN1] Hrynenko and Kukik contend that their convictions were not supported by legally sufficient evidence, that the verdicts were against the weight of the evidence, and that they were deprived of a fair trial by the discharge of a sworn juror who was unavailable for continued service. We affirm.
Maria Hrynenko (Hrynenko) owned and managed six properties in the East Village of Manhattan, including the five-floor building at 121 Second Avenue (121) and the adjacent five-floor building at 119 Second Avenue (119). The first floor of 121 was rented to Sushi Park restaurant, and each of the upper floors contained a single residential unit. In 2013, Hrynenko began to gut-renovate the apartments at 121. She hired Dilber Kukic, an experienced general contractor licensed by the Department of Buildings.
On May 29, 2013, Hrynenko applied to the Department of Buildings (DOB) for permission to renovate the apartments at 121, including installing four new gas meters in the basement to accommodate new appliances for the apartments. At the time, there was one gas meter for all the apartments and one gas meter for the restaurant. The DOB approved the plan on August 14, 2013, and subsequently issued work permits to Kukic, as the general contractor, and codefendant Andrew Trombettas, as the licensed plumber.
In March 2014, Hrynenko applied to Consolidated Edison (Con Ed) for permission to replace the one gas meter for the four apartments with four new gas meters. Con Ed's gas engineering department determined that the existing 1 ¼-inch gas line into the building [*2]was inadequate to carry the additional load needed to power the new appliances and that it would need to install a new three-inch gas line from the street into the building. Con Ed issued a "gas service layout," pursuant to which it would construct a gas line into a "head of service valve" located outside the building's foundation wall, connecting first to a five-inch sleeve installed by defendants and from there to individual gas meters for the restaurant and each of the apartments, and then into the units themselves. Con Ed estimated that the new service would be activated by November 17, 2014.
On April 8, 2014, Con Ed met with Kukic's plumbing subcontractor, codefendant Athanasios Ioannidis, who was not a licensed plumber, at the building to determine the entry point for the new service line. They removed the gas meter for the apartments, leaving the one meter for the restaurant. On May 16, 2014, Con Ed authorized construction of the new three-inch gas service line, anticipating that it would be activated within six months.
In the meantime, Hrynenko rented out the (four-bedroom) apartments, which were still under construction, with leases/occupancy starting August 1, 2014, for around $6,000 per month. In July 2014, after Hrynenko discussed with Kukic the fact that Con Ed would take several months to install the new gas line, defendants connected the gas lines for the apartments to the restaurant meter, using inappropriate flex hoses, to provide gas to the upstairs apartments.
On August 6, 2014, a Con Ed meter reader smelled a strong gas odor and, after investigating, Con Ed discovered the flex hose configuration, which had been leaking. Con Ed issued a "red tag" for illegal piping, shut down the gas service to the building at the service valve, and locked the gas supply. Hrynenko's son, codefendant Michael Hrynenko, who helped manage the building, informed tenants that the gas would be restored shortly after Con Ed finished its work at the building. Con Ed told Hrynenko that gas could only be restored to the restaurant meter after a licensed plumbing contractor had repaired or replaced all defective equipment.
Rather than hiring a licensed plumber to do the work, on August 6, 2014, Hrynenko and Kukic met with Ioannidis and Eric Pacheco, another unlicensed plumber (who testified at trial pursuant to a cooperation agreement), to discuss a plan to restore the gas to 121 by diverting gas from a commercial meter in the basement of 119. Michael Hrynenko assured tenants that day that Con Ed would restore gas service to the building after it fixed a cracked main pipe outside the building.
Two days later, Ioannidis and Pacheco built the unauthorized system, connecting the live gas line from 119 to the 121. The system relied on a main shut-off valve, that allowed gas to flow from 119 to 121, where it connected to a manifold. The manifold branched out to "riser" pipes that connected directly to the apartments. The manifold also branched out to [*3]four pipes leading to the front of the basement, where they connected to the four "meter bars" that were not yet attached to Con Ed meters and were uncapped.
For the system to operate properly, the ball valves on the manifold needed to be in the closed position to direct the flowing gas to the risers and not to the meter bars. Nevertheless, Ioannidis directed Pacheco to remove the handles from the ball valves in the manifold, leaving only the handle for the main shut-off valve and making it more difficult to determine whether the manifold valves were in the open or closed position. Although Pacheco testified that he believed that the system was safe, he knew that if the main shut-off valve and the shut-off valves in the manifold were open at the same time, gas could flow out of those valves, through the pipes leading to the front of the basement, out of the uncapped meter bars, and into that area of the basement.
Hrynenko and Ioannidis had explained to the manager of Sushi Park how to turn on the restaurant's gas from the valve in the basement of 119, and they instructed him to keep the system a secret. On August 11, Trombettas submitted a self-certification affidavit to Con Ed stating that the restaurant piping had been repaired and had passed an integrity test. Con Ed restored gas service to the restaurant's meter on August 15. On August 18, Hrynenko advised Kukic to think about using Sushi Park's licensed plumber in the future because "he is cheaper [and] does the right job." On October 1, Con Ed inspected 121 to authorize the new gas service to the apartments and discovered several minor deficiencies in the piping. On October 8, after Pacheco had fixed these deficiencies, Con Ed deemed the final inspection passed.
On March 26, 2015, the date of the explosion, Con Ed was scheduled to visit the building to examine the piping for the gas delivery system it had authorized. According to Pacheco's testimony, Kukic and Ioannidis argued about how best to keep the Con Ed inspectors from learning about the unauthorized system. As the unauthorized system might have interfered with tests on the authorized piping. Kukic turned off the flow of gas from 119 at the main shut-off valve, and Ioannidis manipulated the ball valves on the manifold, which needed to be open if Con Ed came with new meters and conducted a pressure test on the related piping. In any event, the Con Ed employees found several deficiencies in the piping for the authorized system, which therefore failed the inspection.
At about 2:53 p.m., Kukic and Michael Hrynenko went into 119, emerged about three minutes later and walked towards the entrance to 121. Michael Hrynenko went to tenants' apartments to check that the gas was on. At around 3:00 p.m., Sushi Park employees began smelling gas coming from the basement. They turned off the valve that controlled the flow of gas to their kitchen appliances, but they continued to smell gas. They called Hrynenko, who said that she would send her [*4]son. Michael Hrynenko and Kukic arrived, ran towards the back of the restaurant, then ran out to Seventh Street.
The explosion killed 23-year-old restaurant patron Nicholas Figueroa and 26-year-old restaurant employee Moises Locon and injured 13 others. Fire destroyed 119 and 121, as well as the building at 123 Second Avenue. All four manifold valves were open or substantially open when recovered following the explosion. Fire marshals from the New York City Fire Department's Bureau of Fire Investigation stated that the explosion-causing fire originated in the first-floor kitchen area when natural gas from the basement migrated to the first floor.
The People's experts testified that the possibility that gas would flow through open valves to the meter bars in the unauthorized system into the front of the basement of 121 made the system inherently dangerous. They testified that an inflammable vapor cloud created by the flow of gas through the open meter bars could be ignited by a small spark from a light switch, a water heater or a refrigerator being turned on. They concluded that a large volume of gas that escaped from the unauthorized system's meter bars had ignited in basement and led to a "vented deflagration," i.e., an explosion that followed a pathway of air flowing from the basement, up the stairs to the first-floor restaurant and the front of the building, where it blew out the restaurant faÇade and caused other damage consistent with that pathway.
Defendants' expert testified that the explosion could have resulted from a gas leak that built up over time in a first-floor kitchen appliance and related piping. He opined that the explosion did not start in the basement because the "Bilco" doors leading from the basement to the sidewalk would have been blasted open.
The jury found Hrynenko and Kukic (hereinafter, defendants) each guilty of two counts of second-degree manslaughter, nine counts of second-degree assault, four counts of third-degree assault and one count of second-degree reckless endangerment. The court denied defendants' posttrial motions to dismiss the indictments.
Under the well established principles pertaining to legal sufficiency and weight of the evidence review (see People v Danielson, 9 NY3d 342, 348 [2007]; People v Bleakley, 69 NY2d 490, 495 [1987]), there is no reason to disturb the verdicts. Defendants' convictions for second-degree manslaughter required proof that defendants "recklessly cause[d] the death of another person" (Penal Law [PL] § 125.15[1]). A person acts recklessly with respect to another person's death when he or she "is aware of and consciously disregards a substantial and unjustifiable risk that [the death] will occur," and the risk is "of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation" (PL 15.05[3]). Second- and third-degree assault and reckless endangerment also require the mental [*5]state of recklessness. To warrant a finding that defendants caused a death, it was not necessary to find that they intended the death (see People v Kibbe, 35 NY2d 407, 412 [1974]). It will suffice if it can be said beyond a reasonable doubt that the death was "something which should have been foreseen as being reasonably related to [defendants'] acts" (id.).
Viewed in the light most favorable to the People (see People v Marin, 65 NY2d 741, 742 [1985]), the evidence was legally sufficient to prove that defendants recklessly caused the victims' deaths when they deliberately circumvented safety regulations to create and operate the unauthorized system that diverted natural gas from the building at 119 Second Avenue to the apartments in the building at 121 Second Avenue. Contrary to defendants' primary argument, the explosion was a foreseeable result of their actions. There was ample evidence that defendants, who both had ample experience with buildings and the relevant DOB and Con Ed regulations, understood the risk that death would occur when they proceeded with building and operating the unauthorized gas delivery system (see e.g. People v Reyes, 75 NY2d 590 [1990]). However, Hrynenko needed a gas delivery system to enable her to immediately begin collecting rent for the apartments at 121, so she chose not to wait for Con Ed's permitting and inspection process to be completed for the authorized system and instead had Kukic build an unauthorized and dangerous makeshift system, using unlicensed plumbers, which they hid from Con Ed. The record shows that defendants both had active roles throughout the planning, building and operation of the system.
Defendants' claims that they reasonably relied upon Pacheco's assurances about the safety of the system are unavailing. Although Pacheco testified that, at the time, he did not believe that the system he and Ioannidis built was dangerous, there was no evidence that he made assurances to defendants about its safety. Moreover, even if Pacheco had made assurances to them, it would not have been reasonable for them to rely on those assurances, given that they knew that the system, which Pacheco helped build with another unlicensed plumber, was unauthorized. Indeed, the first unauthorized system for providing gas to the apartments at 121 had resulted in a gas leak, and yet defendants decided to use the same personnel to create the second unauthorized system.
Nor were the verdicts against the weight of the evidence.[FN2] Although defendants' expert testified that the explosion occurred in the first-floor restaurant due to a leak in a kitchen appliance, the jury was entitled to reject that testimony and credit the testimony of the People's expert (see generally People v Miller, 91 NY2d 372, 380 [1998]), who testified that a massive volume of gas escaped from the open meter bars in the unauthorized system, ignited in the basement of 121, and followed a path up the stairs to the first-floor restaurant, then out the front [*6]of the building.
The court providently exercised its discretion in replacing a juror with an alternate after a sufficient into the juror's unavailability (see CPL 270.35[1], [2][a]). The juror's necessary absence would have interrupted the trial for a full day, much longer than the statutory two hours (CPL 270.35[2][a]; see People v Jeanty, 94 NY2d 507, 516-517 [2000]; People v Ramirez, 171 AD3d 437 [1st Dept 2019]; People v Lopez, 18 AD3d 233, 234 [1st Dept 2005], lv denied 5 NY3d 807 [2005]). The juror had a critically important appointment for a career-related examination, which she had already rescheduled because of the trial and could not reschedule again. Missing the examination would have caused her "compelling hardship, rather than
mere inconvenience" (People v Belgrave, 172 AD2d 335, 336 [1st Dept 1991], lv denied 78 NY2d 962 [1991]).
Accordingly, the judgments of the Supreme Court, New York County (Michael J. Obus, J.), rendered January 17, 2020, as amended February 5, 2020, convicting defendants, after a jury trial, of manslaughter in the second degree (two counts), assault in the second degree (nine counts), assault in the third degree (four counts) and reckless endangerment in the second degree, and sentencing each defendant to an aggregate
term of 4 to 12 years, should be affirmed. As to defendant Hrynenko, the matter is remitted to Supreme Court for further proceedings pursuant to CPL 460.50(5).
Judgments, Supreme Court, New York County (Michael J. Obus, J.), rendered January 17, 2020, should be affirmed. As to defendant Hrynenko, the matter is remitted to Supreme Court for further proceedings pursuant to CPL 460.50(5).
Opinion by Acosta, P.J. All concur.
Acosta, P.J., Webber, Kennedy, Shulman, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: June 22, 2021



Footnotes

Footnote 1: Codefendant Athanasios Ioannidis was also convicted of second-degree manslaughter, the indicted assault counts and reckless endangerment, and sentenced to 4 to 12 years. Codefendant Andrew Trombettas was charged with two counts of offering a false instrument for filing in the first degree, he pleaded guilty to one count, and was sentenced to three years of probation and 100 hours of community service. Codefendant Michael Hrynenko died prior to trial.

Footnote 2: Assault in the second degree (PL 120.05[4]), assault in the third degree (PL 120.00[2]), and reckless endangerment in the second degree (PL 120.20) also require the mental state of recklessness. Accordingly, we reject defendants' argument that those convictions should also be set aside as against the weight of the evidence.